United States District Court

Southern District of Illinois

**FILED**

DEC 1 3 2010

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE

Stanley Boclair, # A 60451          )

         Plaintiff          )

        vs.          )

Illinois Department of Corrections, )

Roger Walker, Jr., Donald Hulick,  )

Tina (Beardan) Monroe, Shawn       )

Saddler, Kim Butler,               )

Maue, Darrell Westerman,           )

Leifer, John Does, individually and )

in their official capacities, *     )

        Defendants.          )

Case No. 10-1008-MJR

## Complaint

NOW COMES the Plaintiff Stanley Boclair, pro se, and in support of his complaint states as follows:

### I. Jurisdiction & Venue

1.) This is a civil action arising under, authorized by and

---

\* The first names of Defendants Maue and Leifer, as well as the names of Defendants John Does, are unknown to Plaintiff at this time, but will be forthwith provided to this Court as soon as reasonably possible upon discovery thereof.

brought pursuant to 42 U.S.C. Section 1983 to redress and remedy the deprivation, under color of State law, of the rights guaranteed to Plaintiff and secured by the First, Eight and Fourteenth Amendments to the Constitution of the United States of America. This Court has jurisdiction over this action pursuant to U.S.C. Sections 1331 and 1334 (a) (3). Plaintiff seeks declaratory relief pursuant to 28 U.S.C. Sections 2201 and 2202. Plaintiffs claims for injunction relief are authorized by 28 U.S.C. Sections 2283 and 2284 and Rule 65 of the Federal Rules of Civil Procedure.

2.) The United States District Court for the Southern District of Illinois is an appropriate venue under 28 U.S.C. 1391 (b) (2) because it is where the events giving rise to this cause of action occured.

## II Parties

3.) Plaintiff, Stanley Boclair, is and was at all times mentioned herein, an adult citizen of the United States and a resident of the State of Illinois, and was at all times mentioned herein, a prisoner of the State of Illinois in the custody of the Illinois Department of Corrections and confinded in the Menard Correctional Center in Chester, Illinois. He is currently confined in the Stateville Correctional Center in Joliet Illinois.

4.) Defendant, the Illinois Department of Corrections, was at all times mentioned herein, an entity of the State of Illinois, a creation of the legislature and an agency of the executive branch of guvernment, charged with the care and custody of all persons committed to it by the Courts of the State. See, 730 ILCS 5/3-2.2 (1)(A).

2

5.) Defendant, Roger Walker, Jr., was at all times mentioned herein, the Director of Corrections of the State of Illinois. He was legally responsible for the overall operation of the Department of Corrections, each institution under it's jurisdiction, including Menard Correctional Center and all persons committed thereto. See, 730 ILCS 5/3-2-3 (A) and 3-2-5 (A).

6.) Defendant, Donald Hulick, was at all times mentioned herein, the Warden of Menard Correctional Center. He was legally responsible, as Chief Administrative Officer, for the overall operations of Menard Correctional Center and for the welfare of all the inmates of that prison. See, 730 ILCS 5/3-6-2 (A).

7.) Defendant, Tina (Beardon) Monroe, was at all times mentioned herein, a non-ranking Correctional Officer of the Illinois Department of Corrections who was assigned to the Protective Custody Unit at Menard Correctional Center. She was legally responsible for all persons housed therein.

8.) Defendant, Shawn Sackler, was at all times mentioned herein, a non-ranking Correctional Officer of the Illinois Department of Corrections who was assigned to the Protective Custody Unit at Menard Correctional Center. He was legally responsible for helping to maintain the safety and security of the institution and all person's housed therein.

9. Defendant, Kim Butler, was at all times mentioned herein, an employee of the Illinois Department of Corrections who held the rank of Clinical Services Casework Supervising Counselor and was assigned to Menard Correctional Center. She was responsible for, inter alia, the evaluation of inmates for placement in protective custody.

10.) Defendant,          Maue, was at all times mentioned herein, a Correctional Officer of the Illinois Department Corrections who held the rank of Major and was assigned to the Protective Custody Unit at Menard Correctional Center. He was legally responsible for helping to maintain the safety and security of the institution and all persons housed therein.

11.) Defendant, Darrell   Westerman, was at all times mentioned herein, a Correctional Officer of the Illinois Department of Corrections who held the rank of Lieutenant and was assigned to Menard Correctional Center. He was legally responsible for helping to maintain the safety and security of the institution and all persons housed therein.

12.) Defendant,          Leifer, was at all times mentioned herein, a Correctional Officer of the Illinois Department of Corrections who held the rank of Lieutenant and was assigned to the Protective Custody Unit at Menard Correctional Center. He was legally responsible for helping to maintain the safety and security of the institution and all persons housed therein.

13.) Defendants, John Does, were at all times mentioned herein, employees of the Illinois Department of Corrections who were assigned to Menard Correctional Center. These Defendants names and ranks are unknown at this time.

14.) Each Defendant herein named is sued individually and in his or her official capacity. At all times mentioned herein, each Defendant was a person who acted under color of state law.

-4-

## III. Litigation History

15.) Plaintiff, Stanley Boclair, has filed no other lawsuits in state or federal court pertaining to the same facts involved in this cause of action.

16.) Plaintiff, has filed one previous lawsuit relating to his imprisonment. The parties to the previous lawsuit were Plaintiff, Stanley Boclair, and Defendants, Thomas Page, Donald Snyder, Jr., Nancy Tucker, Doug Cyeald, Michael Atchison, and M.J. Scott, in the United States District Court for the Southern District of Illinois, Docket No. 99-223, under Judge G. Patrick Murphy. The basis of the Plaintiffs claim was that he had been placed in segregation without being afforded due process of law. The lawsuit was filed on April 5, 1999, and the case was dismissed on August 16, 1999.

## IV. Exhaustion of Remedies

17.) Plaintiff, Stanley Boclair, used the prisoner grievance process available at Menard Correctional Center for redress of his complaints. On July 18, 2008, Plaintiff presented the facts relating to this complaint to Defendant Donald Hulick, the Warden of Menard Correctional Center, in an emergency grievance. (Exhibit 6). On July 28, 2008, Defendant Hulick determined that the allegations contained in Plaintiff grievance did not constitute an emergency, and the same was submitted to a Correctional Counselor for review on August 1, 2008. (Exhibit 6). On September 9, 2008, a Counselor denied Plaintiff grievance (Exhibit 6), and the same was referred to and reviewed by the grievance officer on September 17, 2008. (Exhibit 6A). The grievance officer recommended the denial of Plaintiffs grievance, and Defendant Hulick denied the same on September 19, 2008. (Exhibit 6A). On October 14, 2008, Plaintiff filed an appeal from Defendant Hulick's decision (Exhibit 6A), along with an addendum to the grievance (Exhibit 6B) and the affidavit

of an Occurrence witness (Exhibit 6C), to Defendant Roger Walker, Jr., the Director of the Illinois Department of Corrections. On November 24, 2008, the Administrative Review Board the denial of Plaintiff's grievance be affirmed, and Defendant Walker concurred on December 18, 2008. (Exhibit 6 D).

## V. Statement of Facts

18.) Defendant, Roger Walker, Jr., was the Director of the Department of Corrections at all times and during each of the events described hereinafter.

19.) Defendant, Donald Hulick, was Warden of Menard Correctional Center when Plaintiff, signed in to the Protective Custody Unit, and thereafter filed a series of emergency grievances with his Office against several Correctional Officers and employees Regarding each of the events described hereinafter. See, (Exhibits 1 thru 8).[10]

20.) Plaintiff signed into the Protective Custody Unit at Menard on October 1, 2007. At that time, Plaintiff Requested Protective Custody because a "Gold-build, bald-headed African American with a braid under his chin" Had threatened Plaintiff's life while en route from the Medical Station. See, (Exhibit 3).

---

[1] The only grievance that is the subject of this complaint is that which was Filed by Plaintiff on July 18, 2008. (Exhibit 6). All other grievances mentioned herein are incorporated by reference into the grievance which gave rise to this complaint. See, (Exhibit 6). Those grievances and the facts described therein are being offered for the limited purpose of establishing the pattern, chain, and chronological order, of events leading

21) Plaintiff thereafter began to witness, experience, or otherwise become aware of myriad inmate abuses and other correctional staff misconduct occuring on the Protective Custody Unit, shortly after he had signed in. Two such incidents occured on October 17 and October 27, 2007, when one of Plaintiff's fellow inmates by the name of Girkin was assaulted by other prisoners at the direction of, under the supervision of, and in exchange for promises of money and other gifts provided by, several Correctional Officers including Defendants Shawn Saddler and Tina (Beardan) Monroe (hereinafter referred to as "Beardan"). See, (Exhibit 1). Additionally, several correctional officers, including Defendants Saddler and Beardan, personally performed an assault and battery upon inmate Girkin on October 27, 2007, and thereafter filed falsified reports against him. See, (Exhibit 1).

22.) Plaintiff wrote to the Assistant Warden to inform him of the assault of inmate Girkin on October 27, 2007. See, (Exhibit 1). However, the Assistant Warden never received Plaintiffs letter because it was withheld by staff on the Protective Custody Unit. See, (Exhibit 2). The following morning, on October 28, 2007, Plaintiff was retaliated against for attempting to report the incident when Defendant Saddler came to Plaintiff cell and threatened him with physical harm if he persisted in pursuing the matter any further. See, (Exhibits 1 and 2). Being acutely aware of the bodily harm inflicted upon inmate Girkin by staff these threats placed Plaintiff in fear for his own physical wellbeing. See, (Exhibit 1). Out of fear for his own personal safety, and as a result

up to and following the assault on Plaintiff, and the retaliation against him for filing these grievances, all giving rise to the relevant grievance and complaint.

OF THE protective custody staffs withholding of his letter to the Assistant Warden, Plaintiff was forced to file an emergency grievance concerning the matter. See, (Exhibits 1 and 2).

23) Plaintiff filed an emergency grievance with Defendant Hulick on October 29, 2007. (Exhibit 1). At that time, Plaintiff implored Defendant Hulick to compel an end to the rampant abuses and violations of inmate rights occurring on the Protective Custody Unit. (Exhibit 1). Defendant Hulick subsequently reviewed Plaintiffs grievance and determined that neither the assault of inmate Birkin by Defendants Saddler and Beardon and others, nor the threats made toward Plaintiff by Defendant Saddler relative to reporting the same, constituted an emergency. (Exhibit 1).[2] Instead, the matter was referred to Internal Affairs, who subsequently interviewed Plaintiff in relation thereto. (Exhibit 1). Upon interviewing Plaintiff regarding the matter, the Internal Affairs investigator showed nothing but hostility toward Plaintiff for filing a grievance regarding the incident. See, (Exhibit 3). Thereafter, Plaintiffs grievance was forwarded to a correctional counselor who issued a response thereto and, without elucidation as to whether his allegations were substantiated, simply indicated that Plaintiff did not live on the same gallery as inmate Birkin. (Exhibit 1).

24) Plaintiff did not thereafter continue to pursue the aforementioned matter through the normal grievance procedure due to: a) the gravity and nature of the assault carried out upon inmate Birkin by Defendants Beardon and Saddler and others; b) the threats made toward Plaintiff by Defendant Saddler in retaliation for reporting the same; c) the negative reception with

---

[2] Notwithstanding this determination Defendant Hulick transferred inmate Birkin to Pontiac immediately following the filing of Plaintiff grievance concerning his assault.

which his complaint was greeted by the internal affairs investigator; and d) Defendant Hulick's seeming complicity in the violation of inmate rights occuring on the Protective Custody unit. Instead, Plaintiff began a continuous letter writing campaign to the Illinois State Police and others for redress of the matter, which finally culminated in one Mr. Larry T. Sims of the Illinois Department of Corrections Internal Investigations Unit coming to interview Plaintiff regarding the incident, the results of said investigation being unknown to Plaintiff at this time.

25.) Protective Custody staff, meanwhile, moved the inmate who had threatened Plaintiff life — the one which had formed the basis for his signing into Protective Custody in the first place — into a cell three doors down from where Plaintiff was housed on January 23, 2008. See, (Exhibit 3). This occurence made Plaintiff feel as if his safety was in imminent danger. See, (Exhibit 3). As a result, Plaintiff gave both oral and written accounts of this specific threat to several correctional employees, including members of the prison's mental health department, two majors, and the Clinical Services Casework Supervising Counselor, Defendant Kim Butler. See, (Exhibit 3). However, Plaintiff's concerns were ignored at every level. See, (Exhibit 3).

26.) Upon information and belief, staff on the Protective Custody unit (the names and ranks of which are at this time unknown, but collectively and individually referred to hereinafter as Defendants John Doe) moved the aforementioned inmate in such close proximity to Plaintiff with knowledge of the fact that he posed a substantial and unjustifiable risk of harm to Plaintiff, and they intentionally disregarded such risk out of retaliation and in hopes that physical harm would come about to Plaintiff for his filing of a grievance relative to the beating of inmate Girkin by Defendants Beardan and Saddler and other Correctional

9

officer's on the Protective Custody unit, and in relation to the threats made toward Plaintiff by Defendant Saddler for reporting the same; whereas, Plaintiff, specifically and repeatedly told Correctional staff that said inmate had threatened his life both at the time he signed into Protective custody, and when said inmate was moved into the cell next to Plaintiff, but his concerns were consistently ignored. See, (Exhibit 3).

27.) Plaintiff Subsequently filed an emergency grievance with Defendant Hulick concerning the aforementioned facts on February 1, 2008. (Exhibit 3). At that time, Plaintiff expressed his belief that Correctional staff were again being indifferent to his safety and, as evidence that they had been indifferent to his safety in the past, Plaintiff reminded Defendant Hulick of the way in which Correctional staff had responded to his filing of a grievance regarding the assault of inmate Girkin. (Exhibit 3). Plaintiff asserted that for this reason he felt as if he now had no recourse, but that Defendants Hulick and Walker had a duty to protect him from harm. (Exhibit 3). Defendant Maue, a Correctional Major thereafter reviewed Plaintiff grievance in Defendant Hulick's stead and determined that neither the Protective custody staff's placement of the aforesaid inmate in such close proximity to Plaintiff, nor the disregard of his concerns relative thereto by other Correctional staff, constituted an emergency. (Exhibit 3).[3]

28.) Plaintiff next witnessed an episode of staff misconduct less than one week later when staff on the Protective Custody unit abused yet another one of his fellow inmates on February 9, 2008. Specifically, on that date, Plaintiff witnessed

---

[3] Notwithstanding this determination, Defendant Maue placed the aforesaid inmate on administrative deadlock immediately following the filing of Plaintiff grievance until three days later when he was transferred to Lawrence Correctional Center.

Defendant Beardan as she observed an inmate named Abraham stash cookies upon himself while in the dining hall. see, (Exhibit 4). While the inmates were en route to cellhouse, Plaintiff witnessed Defendant Beardan as she had Defendant Darrell    Westerman, search inmate Abraham, find his cookies, then bring him back to the Protective Custody unit; whereupon, the cookies were crumbled up and spread out upon the floor before inmate Abraham as he was told to lick and eat them off the ground unless he wished to go to segregation. see,(Exhibit 4). Plaintiff then witnessed Abraham as he did so, just like a dog, with slobber coming from his mouth " while six to eight Correctional Officers and Correctional lieutenant, De-fendant        Leifer, cheered, laughed and applauded the act. see, (Exhibit 4).

24) Plaintiff filed an emergency grievance with Defendant Hulick concerning the aforementioned facts on February 10, 2008.(Exhibit 4). At that time, Plaintiff advised Defendant Hulick that the aforesaid type of inhumane, de-grading and unprofessional behavior was commonplace on the Protective Custody unit. (Exhibit 4). Plaintiff requested a polygraph examination in order to verify the veracity of his statements, and challenged Defendant Hulick's administration to discipline the wrong-doing and abuses which it knew were taking place. (Exhibit 4). Defendant Hulick subsequently reviewed Plaintiff's grievance and determined that neither the abuse of inmate Abraham by Defendants Beardan, Westerman, Leifer and other Correctional officers, nor the other alleged misconduct occurring on the Protective Custody unit, con-stituted an emergency. (Exhibit 4). The matter was thereafter referred to and reviewed by a Correctional Counselor and a grievance officer, both of whom issued responses thereto indicating that Plaintiff could not lodge complaints on behalf of other prisoners. (Exhibits 4 and 4A). Consequently, the grievance officer recommended and Defendant Hulick ordered, that

the same be denied. (Exhibit 4A). Plaintiff then appealed and following con-
sideration and recommendation by the Administrative Review Board, Defendant
Walker concurred with the denial of Plaintiff grievance on the same basis given
at the institutional level, as well as the additional ground that staff discipline
is purely an administrative decision. (Exhibit 4B).


30.) Plaintiff, in the meantime, was retaliated against by members of the Pro-
tective Custody staff against whom the aforementioned grievance was filed on
February 11, 2008. see, (Exhibit 5). More precisely, on that date, after the in-
stitutional inmate count had cleared and the cells were taken off deadlock
for daily movement a Correctional Officer doubled back and re-deadlocked
Plaintiff's cell. see, (Exhibit 5). When the other inmates doors rolled for lunch
later, Plaintiff was therefore the only one left in his cell. see, (Exhibit 5). As a
consequence, an officer had to specifically come back to open his cell for
lunch and, while he was en route to catch up with the other inmates, Plaintiff
was then and there isolated alone for a time with Defendant Leifer as he
identified Plaintiff to seven other Correctional Officers as being the inmate who
had reported their abuse of inmate Abraham. see, (Exhibit 5). Then, after
finally catching up with the other inmates, Defendant Westerman pulled Plaintiff
out of the line and threatened him in front of several staff and inmates, stating
"why did you lie on me. You think you got your ass whipped in the West House,
you get fucked up now!" see, (Exhibit 5). These threats and intimidation tactics
placed Plaintiff in fear for his safety. see, (Exhibit 5).


31.) Plaintiff filed an emergency grievance with Defendant Hulick concerning
the aforementioned facts on the same date, February 11, 2008. (Exhibit 5).
At that time, Plaintiff complained to Defendant Hulick that his rights under
state and federal law were being repeatedly and blatantly violated with
impunity by staff on the Protective Custody unit for utilizing the available

grievance process to report their wrong-doing and violent acts. (Exhibit 5). Plaintiff requested a polygraph examination for himself, Defendant Westerman, and all inmates who had witnessed him threaten Plaintiff, and further that the appropriate disciplinary action be taken. (Exhibit 5). Defendant Hulick subsequently reviewed Plaintiff grievance and determined that the threats, intimidation and other retaliation inflicted upon Plaintiff by Defendants Leifer and Westerman and other Correctional staff for utilizing the prison grievance system did not constitute an emergency. (Exhibit 5). The matter was thereafter referred to and reviewed by a Correctional Counselor who issued a response thereto indicating that Defendant Westerman denied the incident altogether. (Exhibit 5). But upon being interviewed by the grievance officer, Defendant Westerman changed his tune, stating simply that he could not recall the incident in question. (Exhibit 5A). Consequently, the grievance officer recommended, and Defendant Hulick ordered, that the same be denied. (Exhibit 5A).

32.) Defendant Beardan, who meanwhile had been on maternity leave, returned to work at the Protective Custody unit in the beginning of July 2008. see, (Exhibit 6). By this time the investigations and final resolutions of many of the aforementioned grievances filed against Defendants Saddler, Beardan, Westerman and Leifer were still pending. see, (Exhibits 4A and 5A); see also, (Paragraph 24, supra). Then, less than two weeks after returning to work, Defendant Beardan came to Plaintiff cell and ordered him to move into another cell with an inmate by the name of Denton on July 16, 2008. see, (Exhibit 6). Defendant Beardan, likewise, contemporaneously ordered inmate Denton's cellmate, inmate Evans, to move into the cell occupied prior thereto by Plaintiff. see, (Exhibit 6C).

33. Plaintiff wrote that same evening to the Clinical Services Casework Super-

vising Counselor Responsible for, inter alia, evaluating inmates for protective custody placement, Defendant Butler, expressing his concern that Defendant Beardan and other staff on the Protective Custody unit were attempting to entangle him in turmoil by moving him into the cell with inmate Denton, a mentally unstable individual who had repeatedly been to the prison's psychiatric unit and had shown hostile behavior toward his previous cellmate, inmate Evans. See, (Exhibit 6). Plaintiff's concerns, however, were completely ignored by Defendant Butler.

34.) Plaintiff's fears subsequently came to fruition two days later when he was severely physically assaulted by his cellmate, inmate Denton, on July 18, 2008. See, (Exhibit 6). Specifically, on that date while Plaintiff was washing up at the sink in his cell, inmate Denton called Correctional Officer Robinson to the bars as he was passing out meal trays and said, "I want you to see this." See, (Exhibit 6). Inmate Denton thereafter proceeded to severely beat Plaintiff about the face, head and back with a radio which he had tied up inside a laundry bag. See, (Exhibit 6). As a result of this assault, Plaintiff suffered persistent neck and back pain and now has permanent numbness in his neck. See, (Exhibits 6, 6B, and 7 thru 7D). In addition pieces of Plaintiff teeth were knocked out during the assault and others were loosened, some of which later had to be removed. See, (Exhibits 6, 6B, and 7E).

35.) Plaintiff filed an emergency grievance with Defendant Hulick concerning the aforementioned facts on the same date, July 18, 2008. (Exhibit 6). At that time, Plaintiff reminded Defendant Hulick that he had previously filed emergency grievances with regard to his personal safety, and that he had been threatened in the past by Correctional staff for filing some of the aforementioned grievances. (Exhibit 6). Plaintiff further stated that, it was apparent in light of her past conduct, Defendant Beardan had a propensity to see violent acts

14

carried out, and that he believed she was responsible for orchestrating the events which gave rise to the assault carried out upon him. (Exhibit 6). Plaintiff requested that Defendant Beardan be held accountable for her conduct and that he be provided proper protective custody; More specifically, he requested protection from Defendant Beardan and other Protective custody staff as well as the inmates which they may directly or indirectly influence. (Exhibit 6). Defendant Hulick subsequently reviewed Plaintiff grievance and determined that neither the assault carried out upon him, nor the aforementioned misconduct of Defendant Beardan and other correctional staff, constituted an emergency. (Exhibit 6). Thereafter, the matter was referred to and reviewed by a correctional counselor who issued a response thereto indicating that cell placement is an administrative decision and that Defendant Beardan does not determine when and where inmates are placed. (Exhibit 6). The issue was then forwarded to Internal Affairs for Review. (Exhibit 6A).

36) Plaintiff was subsequently interviewed regarding the aforementioned incident by the internal Affairs investigator. (Exhibit 6B). This interview was conducted by the same investigator who had previously shown animosity toward Plaintiff for filing a grievance regarding the assault of inmate Girkin by Defendants Beardan and Saddler and other Correctional officers, and the subsequent threats made toward Plaintiff by Defendant Saddler relative to reporting the same. (Exhibit 6B). At that time, the aforesaid investigator placed a call to the Placement Office in Plaintiff's presence and thereafter informed him that he had been moved into the cell with inmate Denton in order to make room for the placement of another offender. (Exhibit 6A). Based upon the aforementioned comments of the Correctional Counselor and the investigator, the grievance officer recommended, and Defendant Hulick ordered, that Plaintiff grievance be denied. (Exhibit 6A). Plaintiff then filed an appeal (Exhibit 6A), along with an addendum to the grievance further elaborating

upon the foregoing claims (Exhibit 6B), as well as the affidavit of an occurrence witness, inmate Denton's former cellmate, Evans, attesting to the accuracy of Plaintiff's account of events. (Exhibit 6C). However, following consideration and recommendation by the Administrative Review Board, Defendant Walker concurred with the denial of Plaintiff grievance on the same basis given at the institutional level. (Exhibit 6D).

37.) Plaintiff acknowledges, that the final decision regarding cell placement may in fact be an administrative one, at least in the ministerial sense that final approval of said decision is at that level, but the foregoing comments of the Correctional counselor (Exhibit 6), in toto adopted by the grievance officer and Defendant Halick (Exhibit 6A), as well as the administrative review Board and Defendant Walker (Exhibit 6D), all of which indicate that Defendant Azurdan had no ability to determine or input regarding when and where inmates are placed, are contrary to both the common knowledge and routine practice within the Illinois Department of Corrections generally, and Menard Correctional Center specifically; that being, proposed cell moves are ordinarily initiated by a cellhouse officer and approved by the lieutenant. Furthermore, the internal Affairs investigator's statement indicating that Plaintiff was moved into the cell with inmate Denton in order to make room for the placement of another offender (Exhibit 6B) is contrary to the facts that no new inmates entered the Protective Custody unit, nor were any other cell moves made, between the date of Plaintiff's cell change and the assault carried out upon him. (Exhibit 6B). Similarly, contradictory to that assertion is the fact that Plaintiff's cell move was in reality a cell swap in which Plaintiff was moved into the cell with inmate Denton, while Denton's cellmate, Evans, was moved into the cell with Plaintiff's cellmate. (Exhibit 6C); thus, no room was made to facilitate the placement of any other offender.

38.) Upon information and belief, Plaintiff was moved into the cell with inmate

Denton on the initiative of Defendant Beardan and with the approval of Defendant Leifer, the cellhouse lieutenant in charge of Protective Custody. Upon additional information and belief, Defendants Beardan and Leifer approved, or otherwise moved or permitted Plaintiff to be moved into the cell with inmate Denton out of retaliation and in the hopes that physical harm would come about to Plaintiff for all of the aforementioned grievances filed against them and other Protective Custody staff by Plaintiff, the investigations and final resolutions of which were as aforesaid still pending at the time. See, (Exhibits 4A and 5A); See also, (Paragraph's 24 and 32, supra). Upon further information and belief, Defendant Maue, the cellhouse Major in charge of the Protective Custody unit, approved or was otherwise aware of the fact that Plaintiff was moved into the cell with inmate Denton. Upon yet further information and belief, Defendants Beardan, Leifer, and Maue had knowledge that inmate Denton posed a substantial and unjustifiable risk to safety and well-being of others and disregarded that risk by moving or otherwise permitting Plaintiff to be moved into the cell with Denton; whereas, inmate Denton had repeatedly been to the prison's psychiatric unit and was exhibiting unstable and aggressive behavior by cutting himself and threatening to hurt his previous cellmate in the presence of Protective Custody unit staff, including Defendant Leifer, and thereafter having been taken to the psychiatric ward for an additional few days, Defendant Beardan moved Plaintiff into inmate Denton's cell immediately upon his return to the Protective Custody unit. See, (Exhibits 6 and 6B). Assuming, arguendo, that a person or parties in addition to or other than those aforementioned were responsible for or otherwise approved of moving Plaintiff into the cell with inmate Denton then, upon information and belief, that person or those parties (the names and ranks of which are at this time unknown, but collectively and individually referred to hereinafter as Defendants John Doe) had knowledge of and disregarded the fact that inmate Denton posed a substantial and unjustifiable risk to Plaintiff's personal safety for the same reasons aforesaid.

39.) Plaintiff grievance concerning the aforementioned facts, like those which had preceded it, was of little avail in changing the status quo of correctional staff misconduct on the Protective Custody unit; whereas, after it was denied by Defendant Hulick, Plaintiff continued to face harassment and retaliation by Defendant Beardan for filing aforesaid grievance against her. Specifically, on August 16, 2008 after being escorted to the cellhouse by Defendant Beardan following a Doctor's call line related to the injuries which he had sustained as a result of the aforementioned assault, Plaintiff was locked in his cell and, at that time, Defendant Beardan reached through the chuck and removed one of Plaintiff's hand cuffs and then attempted to mangle his wrist by gripping the other cuff in her fist while twisting and pulling them towards her. See, (Exhibit B). Plaintiff was forced to immediately turn his whole body in the same motion that Defendant Beardan was twisting while pushing his hand, the handcuffs, and his arm even further out of the chuck hole to avoid serious injury. See, (Exhibit B). Then during another occasion on September 25, 2008, while being escorted back to the cellhouse from the prison's Bureau of Identification by Defendant Beardan, Defendant Beardan began laughing and joking with another Correctional Officer about having to go to Internal Affairs regarding her role in the assault carried out upon Plaintiff. See, (Exhibit 6B).


40.) Plaintiff filed an emergency grievance with Defendant Hulick concerning the aforementioned facts on August 17, 2008. (Exhibit B). At that time, Plaintiff complained that Defendant Hulick had repeatedly been deliberately indifferent to his safety. (Exhibit B). As evidence thereof, Plaintiff pointed out that despite filing grievances with Defendant Hulick over Defendant Beardan's role in the assault of inmate Erakin and the threats made toward Plaintiff for reporting the same, as well as her role in the events which gave rise to Plaintiff assault, Defendant Hulick continued to provide Defendant Beardan the access and opportunity to harm, provoke, or cause others to assault Plaintiff. (Exhibit B). Plaintiff further

18

pointed out that Defendants Westerman, Saddler and Beardan had previously threatened to harm him for filing grievances regarding their misconduct; but Defendant Hulick consistently rejected Plaintiff's emergency grievances concerning these threats to his safety. (Exhibit B). Plaintiff requested that Defendant Hulick hold Defendant Beardan accountable for her latest retaliatory actions, and again asked for proper protective custody from violent staff and inmates. (Exhibit B). Defendant Hulick subsequently reviewed Plaintiff's grievance and determined that none of the aforementioned facts constituted an emergency. (Exhibit B).[4] Thereafter, the matter was referred to and reviewed by a correctional counselor who issued a response thereto indicating, predictably, that Defendant Beardan denied the most recent retaliatory allegations, and that, in any event, Plaintiff had been transferred to Pontiac Correctional Center. (Exhibit B).

41.) Upon information and belief, Defendant Hulick transferred, or requested, or approved or otherwise permitted the transfer of Plaintiff from Menard Correctional Center to Pontiac Correctional Center in retaliation for filing the aforementioned grievance charging him with deliberate indifference to Plaintiff personal safety, and in retaliation for filing each of the heretofore mentioned grievances detailing the myriad of abuses, violence, threats, retaliation and other misconduct carried out by or on behalf of correctional staff under his control against Plaintiff and other prisoners under his care. Assuming, arguendo, that a person or parties other than or in addition to Defendant Hulick were responsible for transferring Plaintiff from Menard to Pontiac Correctional Center, then, upon information and belief, that person or those parties (the names and ranks of which are at this time unknown, but collectively and individually referred to hereinafter

---

[4] Notwithstanding this determination, Defendant Hulick transferred Plaintiff to Pontiac Correctional Center immediately following his filing of this grievance.

as Defendants (John Doe) transferred, or requested, approved or otherwise permitted the transfer of Plaintiff for the same retaliatory reasons aforesaid.

42.) Upon information and belief, Defendant Hulick had knowledge that myriad abuses, violence, threats, retaliation, and other misconduct were carried out by or on behalf of correctional staff under his control against Plaintiff and other prisoners under his care, in that Defendant Hulick was either complicit in, or he maintained, approved or was otherwise aware of the utilization by correction staff of a routine, widespread and systematic pattern of physical and psychological abuse against protective custody inmates through the use or threat of violence by staff, or by subjecting them to the same vicariously through the hands of other prisoners, for the purpose of retaliation or other illicit reasons, and Defendant Hulick disregarded the same, thereby permitting staff on the Protective Custody unit the unfettered ability to retaliate against Plaintiff for reporting their wrong-doing and violent acts, which in fact led to the assault carried out upon Plaintiff and continued harassment and retaliation against him; whereas, Plaintiff had filed at least five grievances prior to his assault detailing the abuses, violence, threats, retaliation and other misconduct carried out by or on behalf of correctional staff on the Protective Custody unit against Plaintiff and other inmates (Exhibits 1 thru 5) which were reviewed and rejected by Defendant Hulick on six separate occasions (Exhibits 1, 3, 4, 4A, 5 and 5A), and due to Defendant Hulick's failure to intervene in those instances, Plaintiff was thereafter assaulted as a direct result of Protective Custody staff conduct, following which he filed a grievance (Exhibit 6) that was likewise twice rejected by Defendant Hulick (Exhibits 6 and 6A), thereby permitting and in fact perpetuating yet further harassment and retaliation against Plaintiff by Protective Custody staff. See, (Exhibits 6A and 8).

43.) Upon information and belief, Defendants Walker and the Illinois Department

of Corrections had knowledge that Myriad abuses, violence, threats, retaliation and other misconduct were carried out by or on behalf of Correctional Staff under their control against Prisoners under their care at Menard Correctional Center, in that Said Correctional Staff utilized a routine, widespread, and Systematic pattern of physical and psychological abuse against protective custody in-mates through the use of threats of violence by Staff, or by subjecting them to the same vicariously through the hands of other Prisoners, for the purpose of Re-taliation or other illicit reasons; and Defendants Walker and the Illinois De-partment of Corrections disregarded the same, thereby permitting Staff on the Protective Custody Unit the unfettered ability to retaliate against Plaintiff for reporting their wrong-doing and violent acts, which in fact led to the assault carried out upon Plaintiff and continued harassment of and retaliation against him; whereas, Defen-dants Walker and the Illinois Department of Corrections were made aware on numerous occasions prior to Plaintiff assault by virtue of the grievance pro-cess and by other means that a vast Multitude of abuses, violence, threats, retaliation, and other misconduct were being carried out by or on behalf of correctional Staff against the inmates at Menard Correctional Center as detailed in this case (Exhibits 4 thru 4B; see also, Paragraphs 22 thru 24, supra), and Myriad other cases that have previously come before this court, of which Plaintiff hereby re-quest and this court may take judicial notice (Vance v. Peters 97 F. 3d 987, 942-44 (7th Cir. 1996)), yet Defendants Walker and the Illinois Department of Corrections failed to intervene in any of those instances, thereby permitting, promoting, and for the perpetuating of the conditions which led to Plaintiff being assaulted as a direct result of Protective Custody Staff conduct, the circumstances of which led Plaintiff to File a grievance (Exhibit 6), that, after being denied (Exhibit 6A), engendered yet further harassment of and retaliation against him (Exhibits 6B and 8), all of which was likewise notably disregarded by Defendants Walker and the Illinois Department of Corrections. See, (Exhibit 6D).

21

## VI. Legal Claims

44) Plaintiff, Stanley Buclair, realleges and incorporates by reference paragraphs 1 thru 43, as if fully set forth herein.

45) Defendant Shawn Saddler was deliberately indifferent to Plaintiff's physical safety and psychological well-being, in violation of Plaintiff's right to be free from the infliction of cruel and unusual punishment under the eight Amendment to the United States Constitution, in that Defendant Saddler had knowledge that his conduct posed a substantial and unjustifiable risk of physical or psychological harm to Plaintiff, and he intentionally and recklessly disregarded that risk by threatening to inflict physical harm upon Plaintiff for reporting Defendant Saddler's assault of another inmate, thereby inflicting mental and emotional injury upon Plaintiff and placing him in reasonable apprehension of the imminent infliction of physical harm.

46.) Plaintiff right to petition for redress of grievances under the First Amendment to the United States Constitution was violated when Defendant Saddler threatened to inflict physical harm upon Plaintiff in retaliation for his reporting of Defendant Saddler's assault of another inmate.

47.) Defendants John Doe were deliberately indifferent to Plaintiff's physical safety and psychological well-being in violation of Plaintiff's right to be free from the infliction of cruel and unusual punishment under the eight Amendment to the United States Constitution, in that Defendants John Doe had knowledge that an inmate had threatened Plaintiff's life and therefore posed a substantial and unjustifiable risk of harm to Plaintiff, and they intentionally and recklessly disregarded that risk by moving said inmate in close proximity to Plaintiff, thereby inflicting mental

22

and emotional injury upon Plaintiff and placing him in reasonable apprehension of the imminent infliction of physical harm.

48.) Plaintiff's right to petition for redress of grievances under the First Amendment to the United States Constitution was violated when Defendants John Doe moved an inmate which had threatened to take Plaintiff life in close proximity to him in retaliation for him filing a grievance relative to the assault of another inmate and the ensuing threats made toward him by Protective Custody staff for reporting the same.

49.) Defendant              Leifer was deliberately indifferent to Plaintiff's physical safety and psychological well-being, in violation of Plaintiff's right to be free from the infliction of cruel and unusual punishment under the Eighth Amendment to the United States Constitution, in that Defendant Leifer had knowledge that his conduct posed a substantial and unjustifiable risk of physical or psychological harm to Plaintiff and he intentionally and recklessly disregarded that risk by creating an intimidating and provoking situation wherein Plaintiff was isolated with Defendant Leifer and several other correctional officers while being pointed out as the person whom had reported their abuse of another inmate, thereby inflicting mental and emotional injury upon Plaintiff and placing him in reasonable apprehension of the imminent infliction of physical harm.

50.) Plaintiff's right to petition for redress of grievances under the First Amendment to the United States Constitution was violated when Defendant Leifer intimidated, provoked and otherwise harassed Plaintiff in retaliation for filing his grievance relative to Defendant Leifer's abuse of another inmate.

51) Defendant Darrell Westerman was deliberately indifferent to Plaintiff's physical safety and psychological well-being, in violation of Plaintiff's right to be free from the infliction of cruel and unusual punishment under the Eight Amendment to the United States Constitution, in that Defendant Westerman had knowledge that his conduct posed a substantial and unjustifiable risk of physical and psychological harm to Plaintiff, and he intentionally and recklessly disregarded that risk by threatening Plaintiff with infliction of physical harm for revealing Defendant Westerman's abuse of another inmate, thereby inflicting mental and emotional injury upon Plaintiff and placing him in reasonable apprehension of the imminent infliction of physical harm.

52) Plaintiff's right to petition for redress of grievances under the First Amendment to the United States Constitution was violated when Defendant Westerman threatened Plaintiff with the infliction of physical harm in retaliation for his filing of a grievance relative to Defendant Westerman's abuse of another inmate.

53.) Defendant Kim Butler was deliberately indifferent to Plaintiff's physical safety and psychological well-being, in violation of Plaintiff right to be free from the infliction of cruel and unusual punishment under the Eight Amendment to the United States Constitution, in that Defendant Butler had knowledge that Protective Custody staff had retalitorily moved Plaintiff into the cell with a psychologically unstable inmate who posed a substantial and unjustifiable risk of physical harm to Plaintiff, and she intentionally and recklessly disregarded that risk by failing to take any intervening action on Plaintiff's behalf, thereby inflicting mental and emotional injury upon Plaintiff, placing him in reasonable apprehension of the imminent infliction of physical harm, and ultimately resulting in the infliction of physical harm upon him.

24

54.) Defendant Tina Beardan was deliberately indifferent to Plaintiff's physical safety and psychological well-being, in violation of Plaintiff's right to be free from the infliction of cruel and unusual punishment under the Eight Amendment to the United States Constitution; in that Defendant Beardan had knowledge that an inmate was psychologically unstable and therefore posed a substantial and unjustifiable risk of physical harm to Plaintiff, and she intentionally and recklessly disregarded that risk by moving or otherwise permitting Plaintiff to be moved into the cell with said inmate, thereby inflicting mental and emotional injury upon Plaintiff, placing him in reasonable apprehension of the imminent infliction of physical harm, and ultimately resulting in the infliction of physical harm upon him.

55.) Plaintiff's right to petition for redress of grievances under the First Amendment to the United States Constitution was violated when Defendant Beardan moved or otherwise permitted Plaintiff to be moved into the cell with a psychologically un-stable inmate in retaliation for his filing of grievances relative to Defendant Beardan's assault and abuse of other inmates, and such right was further violated when Defendant Beardan harassed, provoked, and attempted to physical-ly injure Plaintiff in retaliation for his filing of a grievance relative to Defendant Beardan's responsibility for the circumstances which gave rise to the assault carried out upon Plaintiff by the aforesaid psychologically unstable inmate.

56.) Defendant Leifer was deliberately indifferent to Plaintiff's physical safety and psychological well-being, in violation of Plaintiff's right to be free from the infliction of cruel and unusual punishment under the Eight Amendment to the United States Constitution, in that Defendant Leifer had knowledge that an inmate was psychologically unstable and therefore posed a substantial and unjustifiable risk of physical harm to Plaintiff, and he intentionally and recklessly disregarded that risk by approving or otherwise permitting Plaintiff to be moved into the cell with said inmate, thereby inflicting mental and emotional injury upon Plaintiff, placing

him in reasonable apprehension of the imminent infliction of physical harm, and ultimately resulting in the infliction of physical harm upon him.

57.) Plaintiff's right to petition for redress of grievances under the First Amendment to the United States Constitution was violated when Defendant Leifer approved or otherwise permitted Plaintiff to be moved into the cell with a psychologically unstable inmate in retaliation for his filing of a grievance relative to Defendant Leifer's abuse of another inmate.

58.) Defendant Maue was deliberately indifferent to Plaintiff's physical safety and psychological well-being, in violation of Plaintiff's right to be free from the infliction of cruel and unusual punishment under the eight Amendment to the United States constitution, in that Defendant Maue had knowledge that an inmate was psychologically unstable and therefore posed a substantial and unjustifiable risk of physical harm to Plaintiff, and he intentionally and recklessly disregarded that risk by approving or otherwise permitting Plaintiff to be moved into the cell with said inmate, thereby inflicting mental and emotional injury upon Plaintiff, placing him in reasonable apprehension of the imminent infliction of physical harm, and ultimately resulting in the infliction of physical harm upon him.

59) Defendants John Doe were deliberately indifferent to Plaintiff's physical safety and psychological well-being, in violation of Plaintiff's right to be free from the infliction of cruel and unusual punishment under the eight Amendment to the United States constitution, in that Defendants John Doe had knowledge that an inmate was psychologically unstable and therefore posed a substantial and unjustifiable risk of physical harm to Plaintiff, and they intentionally and recklessly disregarded that risk by moving, approving or otherwise permitting Plaintiff to be moved into the cell with said inmate, thereby inflicting mental and emotional injury upon Plaintiff, placing him in reasonable apprehension of the imminent infliction of physical harm, and

ultimately resulting in the infliction of physical harm upon him.

60.) Defendant Donald Hulick was deliberately indifferent to Plaintiff's physical safety and psychological well-being, in violation of Plaintiff's right to be free from the infliction of cruel and unusual punishment under the Eight Amendment to the United States Constitution, in that Defendant Hulick had knowledge that myriad abuses, violence, threats, retaliation, and other misconduct were being carried out by or on behalf of correctional staff under his control against Plaintiff and other prisoners under his care, and he intentionally and recklessly disregarded the same by consistently rejecting Plaintiff's grievances related thereto, by ignoring other evidence thereof, and failing to take any intervening actions with regard thereto, thereby inflicting mental and emotional injury upon Plaintiff, placing him in reasonable apprehension of the imminent infliction of physical harm, and ultimately resulting in the infliction of physical harm upon him.

61.) Plaintiff's right to petition for redress of grievances under the First Amendment to the United States Constitution was violated when Defendant Hulick transferred, or otherwise requested, approved or permitted the transfer of, Plaintiff from Menard Correctional Center to Pontiac Correctional Center in retaliation for filing of grievances relative to Defendant Hulick's deliberate indifference to Plaintiff's personal safety and psychological well-being and the myriad abuses, violence, threats, retaliation and other misconduct carried out by or on behalf of correctional staff under his control against Plaintiff and other prisoners under his care.

62.) Plaintiff's right to petition for redress of grievances under the First Amend-ment to the United States Constitution was violated when Defendants John Doe transferred, or requested, approved or otherwise permitted the transfer of, Plain-tiff from Menard Correctional Center to Pontiac Correctional Center in retaliation for the filing of grievances relative to Defendant Hulick's deliberate indifference

27

to Plaintiff's personal safety and psychological well-being and the myriad abuses, violence, threats, retaliation, and other misconduct carried out by or on behalf of correctional staff under his control against Plaintiff and other prisoners under his care.

63.) Defendants Roger Walker, Jr., and the Illinois Department of Corrections were deliberately indifferent to Plaintiff's physical safety and psychological well-being, in violation of Plaintiff's right to be free from the infliction of cruel and unusual punishment under the Eight Amendment to the United States Constitution, in that Defendants Walker and the Illinois Department of Corrections had knowledge that myriad abuses, violence, threats, retaliation, and other misconduct were being carried out by or on behalf of correctional staff under their control against prisoners under their care at Menard Correctional Center, and they intentionally and recklessly disregarded the same by consistently rejecting grievances related thereto, by ignoring other evidence thereof, and by failing to take any intervening action with regard thereto, thereby inflicting mental and emotional injury upon Plaintiff, placing him in reasonable apprehension of the imminent infliction of physical harm, and ultimately resulting in the infliction of physical harm upon him.

64.) Plaintiff has no plain, adequate or complete remedy at law to redress the wrongs described herein. Plaintiff has been and will continue to be irreparably injured by the conduct of the Defendants unless this Court grants the declaratory and injunctive relief which Plaintiff seeks.

## VII PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Stanley Boclair respectfully prays that this honorable Court enter judgment granting Plaintiff:

65.) A declaration that the acts and OMISSIONS described herein violated Plaintiff's rights under the Constitution and laws of the United States.

66.) A preliminary and permanent injunction prohibiting Defendants Roger Walker, Jr., and the Illinois Department of Corrections from transferring Plaintiff back to Menard Correction Center at any time during the duration of his incarceration, and further ordering each of their officers, agents, employees, and all persons acting in concert or participation with them at Menard Correction Center, including the remaining Defendants named herein, not to engage in the type of conduct described herein in the future.

67.) Compensatory damages in the amount of $ 15,000 against each defendant, jointly and severally.

68.) Punitive damages in the amount of $ 15,000 against each defendant.

69.) A jury trial on all issues triable by jury.

70.) Plaintiff cost in this suit.

71. Any additional relief this Court deems just, proper, and equitable.

Dated  November 10, 2010

Respectfully Submitted,

Stanley Boclair

Stanley Boclair, # A60451
Stateville Correctional Center
P.O. Box 112
Joliet, Illinois 60434


# VERIFICATION

I have read the foregoing Complaint and hereby verify that the matters alleged therein are true, except as to matters on information and belief, and, as to those, I believe the same to be true. I certify under penalty of perjury that the foregoing is true and correct.


Executed by me at Joliet, Illinois
on this ___10___ day of NOVEMBER , 2010 .
Stanley Boclair
Stanley Boclair




Sub___ ___ before me
this ___ ___ of November ___ 2010
Vanessa J. Mathews  11/10/10
Notary Public

VANESSA MATHEWS
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
April 20, 2011